Filed 4/7/23 P. v. Gurion CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

|  |  |
|---|---|
| THE PEOPLE, | C095288 |
| Plaintiff and Respondent, | (Super. Ct. No. 21F8113) |
| v. | |
| GABRIEL RAY GURION, | |
| Defendant and Appellant. | |

This case arises out of a police chase involving a vehicle and foot pursuit. A jury found defendant Gabriel Ray Gurion guilty of driving in willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer (Veh. Code, § 2800.2, subd. (a)),[1] driving without a valid driver's license (§ 12500, subd. (a)), and leaving the scene of an accident resulting in damage to property (commonly referred to as hit-and-run) (§ 20002, subd. (a)). The trial court suspended imposition of sentence and

---

[1] Undesignated statutory references are to the Vehicle Code.

1

placed defendant on probation for two years with various terms and conditions, including that he serve 216 days in county jail.

On appeal, defendant raises a number of contentions, including evidentiary error, a violation of his constitutional rights to counsel and a fair trial, and insufficiency of the evidence. Finding no prejudicial error, we affirm the judgment.

## FACTUAL BACKGROUND

On October 14, 2020, Deputy Joseph Emmi of the Calaveras County Sheriff's Department was in uniform and on patrol in a fully marked police vehicle. At approximately 4:18 p.m., Emmi observed a Honda sedan with an inoperable brake light driving westbound on Winton Road toward the town of West Point. After relaying the Honda's license plate to dispatch, Emmi activated the patrol vehicle's emergency lights and attempted to initiate a traffic stop. The driver of the Honda accelerated. In response, Emmi activated his siren, and a chase ensued. During the pursuit, the Honda reached speeds of 65 miles per hour and crossed the double solid line on Highway 26, traveling westbound in the eastbound lane. Oncoming traffic was forced to yield to avoid a head-on collision with the Honda.

The pursuit ended after approximately 1.2 miles when the Honda crashed into a fence while attempting to turn onto Bald Mountain Road. Deputy Emmi stopped his patrol vehicle perpendicular to the Honda, approximately 15 feet from the driver's door. Immediately thereafter, the (male) driver got out of the car and fled on foot. When the man did so, he was facing the front of Emmi's patrol vehicle.

Deputy Emmi chased after the man on foot but was unable to apprehend him. During the foot pursuit, the man disregarded Emmi's verbal commands to stop. Shortly after the man escaped, Emmi identified defendant as the driver from a photograph, with the assistance of the probation department. Defendant was not the registered owner of the Honda, but he lived on Bald Mountain Road.

At trial, the defense theory was mistaken identity. The only disputed issue was whether defendant was the driver/perpetrator. Deputy Emmi was the prosecution's sole witness. We will supply additional details in Part I of the Discussion, *post.*

2

## DISCUSSION

### I

### *Alleged Evidentiary Errors*

Defendant raises two claims of evidentiary error, which we address in turn below.

A. *Inadmissible Hearsay*

Defendant initially contends the trial court prejudicially erred by failing to exclude as hearsay a statement from the police dispatcher advising Deputy Emmi that the probation department believed defendant was the driver of the Honda. Defendant argues this statement was "unidentified multiple hearsay," which lacked trustworthiness and was not state-of-mind evidence.

#### 1. *Additional Background*

During the foot pursuit, Deputy Emmi gave the police dispatcher a general description of the perpetrator. He described the perpetrator as a Hispanic male adult, who was around five foot five inches tall and weighed approximately 150 pounds, wearing black clothes and a black hat. Shortly after the perpetrator escaped, the dispatcher advised Emmi that the probation department had identified two potential suspects.

At trial, the prosecutor elicited the following testimony from Deputy Emmi regarding the potential suspects:

"[THE PROSECUTOR]: Okay. When [dispatch] advised you of the potential subjects, . . . what did it relay to you?

"[DEPUTY EMMI]: Probation advised that Richard Kessler and Gabriel Gurion were inside the vehicle approximately –

"[DEFENSE COUNSEL]: Objection. Hearsay.

"THE COURT: I'll sustain it.

"[¶] . . . [¶]

"[THE PROSECUTOR]: Did you get any names of suspects?

"[DEPUTY EMMI]: Yes, I did.

"[THE PROSECUTOR]: Okay. And what were the names again?

"[DEPUTY EMMI]: Richard Kessler.

3

"[THE PROSECUTOR]: And did you get a description of Mr. Kessler?

"[DEPUTY EMMI]: I did, yes.

"[THE PROSECUTOR]: What was the description?

"[DEPUTY EMMI]: Five foot - -

"[DEFENSE COUNSEL]: I'm going to object at this time.

"[THE PROSECUTOR]: Your Honor, this goes to the officer's state of mind.

"[¶] . . . [¶]

"[DEPUTY EMMI]: So Richard Kessler -- dispatch advised me that the subject –

"[DEFENSE COUNSEL]: Objection.  Hearsay.

"[THE PROSECUTOR]: Your Honor, again, state of mind.

"THE COURT: And how was the state of mind of this witness relevant?

"[THE PROSECUTOR]: It's going to go through exactly how the officer went about investigating who or what the name of the subject was.

"THE COURT: Members of the jury, the court is going to allow some hearsay testimony which is normally excluded.  I'm allowing it for a non-hearsay purpose, for the limited purpose to explain the officer's subsequent actions.  But it's admitted for that limited purpose only to explain what the officer did afterwards.  It's not admitted for the truth of the statements made to the officer.  And so you shall consider this evidence for that limited purpose only.

"[DEFENSE COUNSEL]: May I further my objection just by saying, you know, the dispatcher is not the source of the information, right?  Somebody has to tell the dispatcher who is saying something who --

"[THE PROSECUTOR]: Your Honor -- may we approach, your Honor?

"THE COURT: I've made my ruling.

"[¶] . . . [¶]

"[THE PROSECUTOR]:  So you may continue.

"[DEPUTY EMMI]: Richard Kessler was described as a 5'9" Native American male and approximately 230 pounds and over 40 years old.

4

"[THE PROSECUTOR]: Okay. And did that match the description of the individual that you saw?

"[DEPUTY EMMI]: No, it did not.

"[THE PROSECUTOR]: And did you do anything with that information?

"[DEPUTY EMMI]: I discarded that information.

"[THE PROSECUTOR]: Okay. Did you input that information anywhere?

"[DEPUTY EMMI]: I did not.

"[THE PROSECUTOR]: Why not?

"[DEPUTY EMMI]: It wasn't relevant to the actual – to my actual report or my investigation.

"[THE PROSECUTOR]: Okay. Was there another subject that was relayed to you as a potential suspect?

"[DEFENSE COUNSEL]: Objection. From Where? Vague.

"[THE PROSECUTOR]: From Dispatch.

"[¶] . . . [¶]

"[THE PROSECUTOR]: So, Officer, now I'm still talking about the information that dispatch has relayed to you. You said that they relayed to you that there were two subjects. What was the name of the second subject?

"[DEFENSE COUNSEL]: Objection. Vague and ambiguous as to who 'they' is.

"THE COURT: Overruled.

"[¶] . . . [¶]

"[THE PROSECUTOR]: You may answer.

"[DEPUTY EMMI]: Gabriel Gurion.

"[THE PROSECUTOR]: Okay. And did they give you a description?

"[DEPUTY EMMI]: Yes.

"[¶] . . . [¶]

"[THE PROSECUTOR]: Did dispatch relay a description of an individual?

"[DEFENSE COUNSEL]: Objection. Compound, hearsay.

5

"THE COURT: It's overruled but admitted only for the limited purpose of explaining the officer's subsequent behavior and actions.

"[¶] . . . [¶]

"[THE PROSECUTOR]: So the question was did dispatch relay over information regarding Gabriel Gurion?

"[DEPUTY EMMI]: Yes, dispatch did.

"[THE PROSECUTOR]: And what was the information that dispatch --

"[DEFENSE COUNSEL]: Objection. Compound, hearsay. . . .

"[¶] . . . [¶]

"THE COURT: It's overruled.

"[¶] . . . [¶]

"[THE PROSECUTOR]: You may answer.

"[DEPUTY EMMI]: Dispatch advised that the subject is Gabriel Gurion, was born 5/06/1998, 5'4," and approximately 130 pounds.

"[THE PROSECUTOR]: Okay.

"[DEPUTY EMMI]: And a Native American male.

"[THE PROSECUTOR]: Okay. And did you input that information anywhere?

"[¶] . . . [¶]

"[THE PROSECUTOR]: Okay. So the information that you received from dispatch, what did you do with that information?

"[DEPUTY EMMI]: I used that information to look the subject up in my mobile database which is located in my patrol vehicle.

"[¶] . . . [¶]

"[THE PROSECUTOR]: Okay. And . . . what type of information did you get back?

"[DEPUTY EMMI]: [T]he subject's date of birth, description, and a photograph of the subject."[2]

Shortly thereafter, Deputy Emmi told the police dispatcher that defendant was the perpetrator.

At trial, Deputy Emmi confirmed that defendant was the perpetrator, explaining that he identified defendant from the photograph in his "mobile database."[3] When asked, Emmi stated that he made the identification three to five minutes after he saw defendant's face. Emmi explained that, from the front seat of his patrol vehicle, he saw defendant's face for approximately two to three seconds when defendant got out of the Honda and faced the front of the patrol vehicle. Later, Emmi explained that defendant briefly "glance[d]" at him before running away on foot. Defendant had been approximately 15 feet from Emmi when he got out of the Honda; it was a clear day and there was nothing obstructing Emmi's view of defendant, who was wearing baggy clothing and a "flat brimmed baseball hat." When Emmi was asked why he described defendant as a Hispanic male, he said, "Just based on the complexion of [defendant's] skin," which he described as being "[d]arker colored, like a tan . . . complexion."

The defense presented evidence that two probation officers were listening to the radio when Deputy Emmi was speaking with the police dispatcher. When asked, the dispatcher explained that somebody from the probation department contacted her office and advised that "probation" believed defendant was the perpetrator. The dispatcher further explained that this information was received by a "call-taker" (i.e., a person responsible for answering the phone in the dispatch office), who then relayed the information to her. The dispatcher noted that defendant was identified as a suspect "for the first time" by "probation."

---

[2] During the foregoing exchange, defense counsel interposed objections claiming that the prosecutor had failed to disclose certain information to the defense. The trial court overruled the objections. These rulings are not challenged on appeal.

[3] This photograph was shown to the jury and admitted into evidence.

## 2. *Applicable Legal Principles*

Hearsay evidence is an out-of-court statement "offered to prove the truth of the matter stated" and is inadmissible unless authorized by a recognized exception. (Evid. Code, § 1200, subds. (a), (b); *People v. Nelson* (2012) 209 Cal.App.4th 698, 707.) An out-of-court statement that is not offered for its truth is not hearsay and may be admitted for a nonhearsay purpose. (*People v. Ervine* (2009) 47 Cal.4th 745, 775.) The nonhearsay purpose must be relevant to a matter at issue in the case. (*People v. Montes* (2014) 58 Cal.4th 809, 863.)

" ' "[O]ne important category of nonhearsay evidence—evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162 (*Livingston*).) In short, the evidence is being offered for the "effect on the listener."

## 3. *Analysis*

We see no evidentiary error. Deputy Emmi's testimony that the police dispatcher identified defendant as a potential suspect was not inadmissible hearsay. The dispatcher's statement was not used to prove that defendant was in fact the perpetrator. Instead, the statement was used to explain how Emmi identified defendant as the perpetrator; that is, the statement explained subsequent action taken by a law enforcement officer during his investigation into criminal conduct. Identity was the only disputed issue at trial, and Emmi's testimony about the dispatcher's statement was relevant to that issue. Accordingly, the trial court did not err in admitting the evidence. (See *People v. Bell* (2019) 7 Cal.5th 70, 98-100 [out-of-court statement by deceased codefendant to a detective was properly admitted for the purpose of explaining subsequent inaction by the detective--why the detective did not pursue forensic testing of a possible bloodstain found on the codefendant's car]; *People v. Samuels* (2005) 36 Cal.4th 96, 122 [out-of-court statement by a detective to another detective was properly admitted for the purpose of

8

explaining the subsequent action taken by the second detective--obtaining search warrants and making contact with a murder suspect].)[4]

We are not persuaded by defendant's argument that the police dispatcher's statement about defendant being a potential suspect was inadmissible because it did not meet the requirements for the declarant's state of mind exception pursuant to Evidence Code section 1250. The dispatcher's statement was not offered to prove her state of mind. Rather, as we have explained, it was offered for the purpose of establishing that the statement imparted certain information to the hearer (i.e., Deputy Emmi), and that Emmi, believing such information to be true, acted in conformity with that belief. The dispatcher's statement was nonhearsay, since it was Emmi's reaction to the statement that was the relevant fact sought to be proved, not the truth of the matter asserted in the dispatcher's statement. (*Livingston, supra*, 53 Cal.4th at p. 1162.)

Nor do we agree with defendant's suggestion that the challenged evidence should have been excluded as a testimonial out-of-court statement admitted in violation of his right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36.[5] Even if this

---

[4] We recognize that the challenged evidence arguably contained multiple layers of hearsay insofar as Deputy Emmi indicated that an unidentified person from the probation department told dispatch that defendant was a potential suspect. Double hearsay is admissible if a justification for admitting the evidence rebuts the hearsay objection at each level. (Evid. Code, § 1201; *People v. Anderson* (2018) 5 Cal.5th 372, 403).) Here, the statement made by the unidentified person from the probation department to dispatch was nonhearsay, since it was not offered for the truth of the matter asserted but rather to explain the subsequent action taken by the police dispatcher--relaying the information to Emmi. (*Livingston*, *supra*, 53 Cal.4th at p. 1162.)

[5] In *Crawford*, the United States Supreme Court held that "a criminal defendant has the Sixth Amendment right to confront and cross-examine any witness who offers a testimonial out-of-court statement against the defendant." (*People v. Trujeque* (2015) 61 Cal.4th 227, 275.) "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford v. Washington, supra*, 541 U.S. at p. 59.)

issue were preserved for appellate review (which it was not),[6] the police dispatcher's statement identifying defendant as a potential suspect was nonhearsay and not subject to the analysis in *Crawford*. (See *People v. Bell*, *supra*, 7 Cal.5th at p. 100 [out-of-court statements that are not offered for their truth are not hearsay, nor do they run afoul of the confrontation clause]; *Livingston, supra*, 53 Cal.4th at pp. 1163-1164 [" 'there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes' "]; *People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1224-1225 [finding that portions of a police dispatch tape were not subject to the analysis in *Crawford* because the statements on the tape were nonhearsay, as they were not offered to establish the truth of the matters asserted].)

B. *"Multiple Briefings" Evidence*

Next, defendant contends the trial court prejudicially erred and denied him a fair trial by allowing Deputy Emmi to testify that defendant was the subject of "multiple briefings" at the Sheriff's Department.[7]

We deem this claim of error forfeited. Defendant failed to support it with citation to pertinent authority and reasoned legal analysis. A touchstone legal principle governing appeals is that "the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record;

---

[6] Defendant forfeited this issue because he failed to raise a confrontation clause objection at trial. (*People v. Redd* (2010) 48 Cal.4th 691, 730, fn. 19 [hearsay objection did not preserve confrontation clause objection].)

[7] In his police report, which was not admitted into evidence, Deputy Emmi stated that he had "prior contacts with the subject [i.e., defendant] and his family." On direct examination, Emmi testified that he had heard defendant's name mentioned during "patrol briefings," explaining that defendant had prior contacts with law enforcement. Upon further questioning, Emmi explained that he did not have "any personal interactions" with defendant prior to the events giving rise to this case, although he had seen defendant "around town." Emmi indicated that defendant's prior contacts with law enforcement involved other officers.

otherwise, the argument may be deemed forfeited. [Citations.] [¶] It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656; see also *Hernandez v. First Student, Inc*. (2019) 37 Cal.App.5th 270, 277 [" '[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].) When, as here, "an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary." (*Landry v. Berryessa Union School Dist*. (1995) 39 Cal.App.4th 691, 699-700 (*Landry*); see *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [claim presented without "adequate" supporting legal argument was "not properly raised"].) Defendant's legally unsupported argument that this testimony was "just more dirt on the appellant" is not sufficient for our review.

II

*Electronic Court Calendar*

Defendant contends reversal is required because the trial court's electronic court calendar, which was located outside the courtroom, showed that he had three other pending criminal cases. According to defendant, the court erred by failing to conduct an inquiry to determine how many of the prospective jurors saw the electronic court calendar or declare a mistrial.

A. *Additional Background*

The jury was selected on the first day of trial. Prior to entering the courtroom, the prospective jurors gathered in the jury assembly room and were given hardship forms to complete. From 8:30 a.m. to 9:27 a.m., the parties and the trial court discussed various issues outside the presence of the prospective jurors, including the jury selection process and several in limine motions.

The jury selection process began at 9:34 a.m. and ended at 4:27 p.m. Thereafter, the trial court pre-instructed the jurors that were sworn to try this case. Among other things, the jurors were instructed on how the trial would be conducted and the basic

11

functions and duties of a juror. As relevant here, the jurors were told that their verdicts must be based solely on the evidence presented at trial and the law provided by the court, that it would be unfair to the parties if they received additional information from any source, and that they must immediately notify the bailiff if they receive information about the case from any source outside of the trial.

The next morning, the following discussion occurred outside the presence of the jury before opening statements:

"[DEFENSE COUNSEL]: You know, out of abundance of caution could I ask that the Rolodex that is open to the public in this building and outside the courtrooms delete my client's other three cases?

"THE COURT: Yeah, I think --

"THE BAILIFF: I took care of it.

"[DEFENSE COUNSEL]: You took care of it?

"THE COURT: We'll order that done this morning.

"[DEFENSE COUNSEL]: Thank you.

"[THE PROSECUTOR]: And, your Honor, I just want to make sure a thorough record of that as well. [Defense counsel] brought this to our attention at which point our deputy bailiff radioed over the issue from yesterday as it was put on the record, and at that time only two jurors had arrived, and there has been no record yet that either of those jurors had seen that information.

"THE COURT: Well, let's just make sure it's out of the public viewing."

Later that same day, defense counsel, again, complained about defendant's other criminal cases being included on the trial court's electronic calendar. In doing so, counsel indicated that the inclusion of this information on the calendar was "almost like" admitting uncharged misconduct evidence.[8] In response, the trial noted that, when this

---

[8] As part of the discussion regarding this issue, defense counsel mentioned "1109," which apparently was a reference to Evidence Code section 1109. Although unclear, it appears that defense counsel misspoke and meant to reference Evidence Code section

issue was brought to its attention, it ordered that the information be removed.

B. *Applicable Legal Principles*

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 294.)

" ' "[I] is settled that a conviction cannot stand if even a single juror has been improperly influenced." ' " (*People v. Nesler, supra,* 16 Cal.4th at p. 578.) "Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias." (*Ibid*.)

"When a court has been put on notice that there may be good cause to discharge a juror, it 'must conduct a sufficient inquiry to determine facts alleged as juror misconduct.' [Citation.] The trial judge is afforded broad discretion in deciding whether and how to conduct an inquiry to determine whether a juror should be discharged." (*People v. Clark* (2011) 52 Cal.4th 856, 971; see *People v. Ray* (1996) 13 Cal.4th 313, 343 [the decision whether to investigate the possibility of juror bias or misconduct rests within the sound discretion of the trial court].)

C. *Analysis*

Initially, we conclude defendant has forfeited his claim of error by failing to object to the trial court's response to the possibility of juror misconduct and by failing to request a more extensive inquiry or investigation into the matter. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 59.)

Forfeiture aside, we see no abuse of discretion. There was nothing presented to the trial court indicating that any juror sworn to try this case actually saw the information

---

1101, which concerns prior uncharged misconduct. Evidence Code section 1109 concerns prior uncharged acts of domestic violence.

on the electronic court calendar showing that defendant had three other pending criminal cases. During the discussion of this issue outside the presence of the jury on the second day of trial, the prosecutor explained that while the information about defendant's other criminal cases was removed after two *prospective* jurors had arrived on the first day of trial, there was nothing to indicate that either of those individuals saw the information. No member of the jury reported seeing the information. And there was no showing that the two prospective jurors who could have seen the information were sworn to try this case. In short, because defense counsel merely speculated that prospective jurors may have seen the information on the electronic court calendar, no duty arose on the part of the trial court to conduct a more extensive inquiry or investigation into the matter. (See *People v. Davis* (1995) 10 Cal.4th 463, 548 [no duty to investigate juror misconduct or bias that is based on mere speculation].) Defendant, for his part, cites no authority supporting a contrary result.

## III

### *Trial Court's Response to Jury Note*

Defendant contends the trial court committed reversible error by failing to advise his counsel of the jury's note indicating that it was "hung." He argues the court violated Penal Code section 1138 and his right to counsel and a fair trial.

A. *Additional Background*

The jury began deliberating at 11:20 a.m. on June 4, 2021. Shortly thereafter, the following exchange occurred between defense counsel and the trial court:

"THE COURT: If there are any questions from the jury -- first of all, if they want read back what I'll do is order the reporter to go in and provide read back, and we'll call your office and tell you what's going on. I assume counsel would waive your appearances and the defendant's appearance while the read back is taking place?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: If other notes come through -- and some are just so basic I don't need to even discuss it because the answer's obvious -- I'll just answer the question and have the bailiff or the clerk call you and let you know what I've done.

14

"If there are any complex questions that need input from counsel, would you like to come back to the court and talk about it here in person, or would you allow us to have like sequential telephone calls to answer? How do you prefer we do that?

"[DEFENSE COUNSEL]: I would think you should attempt to phone . . . first, and then if we think it's too tough to deal with over the phone we could ask to come back.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: Is that all right?

"THE COURT: Would it be all right if there is ex parte communications about the question to get input as to whether or not you need to be here?

"[DEFENSE COUNSEL]: Yeah, I don't have a problem with that."

At 11:52 a.m., the jury sent a note to the trial court requesting "readback regarding Kesslar + Gurion associated w/ vehicle." Thereafter, both the prosecutor and defense counsel were notified of the note and the court's decision to grant the jury's request. At 1:15 p.m., the court reporter advised the court that the read back was completed.

At 2:11 p.m., the jury sent a note to the trial court indicating that it was "hung." The court responded with instructions for the jury to keep deliberating until at least 4:00 p.m. Both defense counsel and the prosecutor were advised of the jury's note and the court's response.

At 3:14 p.m., the jury sent a note to the trial court requesting read back of "cross-exam of Emmi - Q/A Re preliminary hearing testimony," and "cross-exam Q re when suspect got out of vehicle." Shortly thereafter, the court signed the note but did not provide an answer to the jury's request.

At 4:02 p.m., the jury reached verdicts, finding defendant guilty as charged. Immediately thereafter, the trial court explained its reasoning for directing the jury to continue deliberating: "When I got a note about 2:15 or so that you [i.e., the jury] thought that you were hung I'm thinking, you know, it was after 11:30 that we finished here in court. And I knew you went to lunch I'm guessing for about an hour. And I know you had some read back, which I assume would have taken a half hour or so. So

15

you only had deliberated for an hour and a half at most when you told me you're deadlocked. And I just wanted you to give it the old college try to see if it's possible that you could have a verdict instead of having to declare a mistrial and have it tried by a fresh group of 12. The case would not gotten any stronger or weaker by either side if another 12 people heard it. And you all look like you're reasonable persons and I'm glad I didn't pull the trigger so early and go home at 2:00."

Defendant filed a motion for new trial, arguing that such relief was warranted because he did not have the opportunity to address the jury's note indicating that it was deadlocked. Specifically, defendant complained that he was denied the opportunity to advise the jury that the statements at trial connecting him to the Honda were only relevant to show Deputy Emmi's "mental state" and could not be considered for the truth of the matter asserted. At the hearing on the motion, defense counsel explained that, had he been informed of the jury's note, he would have made a record that the police dispatcher's statement that defendant was "associated" with the Honda was a "problem."

In denying defendant's motion, the trial court explained: "We did have discussions if there would be some simple issues the court could respond to the jury questions and notify counsel. And I believe as soon as the court made its ruling telling the jury [to continue deliberating]." [Y]ou [i.e., defense counsel] were notified immediately thereafter by a phone call. [¶] And this was the instructions of the court: Any additional argument from counsel would not have assisted the court. And the jury had been out like two-and-a-half hours at most, and that included a significant amount of time of read back of the testimony during the trial. So they only deliberated for like an hour and a half or so, and I'm not going to declare a mistrial after an hour and a half after three days of trial. So that's why the court just said nope . . . continue on with your deliberations. [¶] You know, if they still were hung up at 4:00 I may have said welcome back tomorrow morning. But I just think that was a no-brainer. I'm not going to pull the trigger on a hung jury after an hour and a half of deliberations. So I can't find any significant error there."

16

The trial court further explained its perspective that there was no error in allowing Deputy Emmi to testify about the police dispatcher's statements indicating that defendant was associated with the Honda. The court also noted that the jury was instructed that this evidence was admitted for a limited purpose.

B. *Analysis*

As an initial matter, we conclude defendant forfeited his claim of error by failing to support it with citation to pertinent authority and reasoned legal analysis. (*Keyes, supra,* 189 Cal.App.4th at pp. 655-656; *Hernandez v. First Student, Inc.*, *supra*, 37 Cal.App.5th at p. 277.) In his opening brief, defendant devotes a single conclusory paragraph to this issue, citing one case for the general proposition that communications from the jury "should be entertained in open court with notification of counsel." (*People v. Hogan* (1982) 31 Cal.3d 815, 848, overruled on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) Given defendant's inadequate briefing, no further discussion of this issue is required. (*Landry*, *supra*, 39 Cal.App.4th at pp. 699-700; see *People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."].)

But even if this claim of error was not forfeited due to inadequate appellate briefing, it nonetheless fails. Contrary to defendant's contention, the record reflects that his counsel was advised of the jury's note indicating that it was "hung" and the trial court's response directing the jury to continue deliberating. Defendant did not object to the court's handling of the note until after the jury rendered its verdicts. The filing of a motion for new trial is not a substitute for a timely, specific objection at trial because it does not give the court the opportunity to correct any error and mitigate prejudice. As such, defendant failed to preserve the issue for appellate review. (See *People v. Cowan* (2010) 50 Cal.4th 401, 486 [the filing of a motion for new trial does not revive claims that have not been preserved by a timely and specific objection]; *People v. Williams*, *supra*, 16 Cal.4th at p. 254 [rejecting contention that "subsequent arguments in a motion for new trial may substitute for a timely objection"]; see also *People v. Boyette* (2002) 29 Cal.4th 381, 430 [failure to object to trial court's answer to jury note waives claim of

17

error]; *People v. Price* (1991) 1 Cal.4th 324, 414 [failure to object to the manner in which the trial court handled the jury's request forfeited challenge].)

IV

*Request for Read Back of Testimony*

Defendant contends he was denied a fair trial because the trial court failed to "allow the jury to have readback" of certain testimony given by Deputy Emmi.

A. *Additional Background*

As noted *ante*, the jury began deliberating at 11:20 a.m. on June 4, 2021. At 3:14 p.m., approximately one hour after the jury sent a note indicating that it was "hung," the jury sent another note requesting read back of "cross-exam of Emmi - Q/A Re preliminary hearing testimony," and "cross-exam Q re when suspect got out of vehicle." Shortly thereafter, the trial court signed the note but did not provide an answer to the jury's request. Less than an hour later, the jury found defendant guilty as charged.

B. *Analysis*

We initially conclude that defendant has forfeited his claim of error by failing to challenge the manner in which the trial court handled the note. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 430; *People v. Price*, *supra*, 1 Cal.4th at p. 414.) Defendant did not object or move for a new trial on this basis.

In any event, even assuming the claim were preserved for appellate review, it fails on the merits. A trial court must satisfy a jury's request to have testimony reread. (Penal Code, § 1138; *People v. Box* (2000) 23 Cal.4th 1153, 1213, disapproved of on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.)[9] However, nothing in the record indicates that the court refused to provide the requested read back. Rather, the

[9] Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

record discloses that the jury implicitly withdrew its request before the read back could be arranged.

*People v. Gonzales* (1968) 68 Cal.2d 467, compels rejection of defendant's claim. There, the jury, after deliberating for several hours, requested read back of certain testimony. (*Id.* at p. 472.) In response, the trial court advised the jury that the court reporter would not have his notes available until the following morning. (*Ibid.*) The court informed the jurors that it would be unfair for them to take the attitude that, since the testimony might be unavailable until the next day, they would terminate their deliberations one way or the other without the read back. (*Ibid.*) The court also told the jurors that they could continue deliberating that afternoon but, if it was impossible to do so without the requested testimony, they could stop deliberating until the next morning. (*Ibid.*) Fifteen minutes later, the jury reached a guilty verdict. (*Ibid.*) On appeal, our Supreme Court found no error in the court receiving the verdict without reading the testimony to the jury. In so finding, the high court explained: "It . . . appears that before the [trial] court was able to fulfill the request the jury manifestly decided that the reading of the testimony was unnecessary." (*Id.* at pp. 472-473; see also *People v. Stafford* (1973) 29 Cal.App.3d 940, 943-945 [no error occurred where jury reached verdict before hearing read back of testimony]; *People v. Warren* (1900) 130 Cal. 678, 681-682 [no error found where trial court informed jury that requested read back could not take place until the next day, and the jury returned with its verdict before hearing read back].)

The circumstances of this case are similar to those in *Gonzales*. As previously indicated, the trial court never refused the jury's request for read back. And it is apparent that the jury decided it could reach verdicts without the read back. Less than one hour elapsed between the court's receipt of the jury's note requesting read back and the verdicts. On this record, we cannot conclude that the court failed to respond to the jury's request in a timely manner or that the delay in providing a response amounted to a denial of the request. While the record does not disclose the court reporter's availability, defendant cites no authority holding that a court's failure to immediately provide read back amounts to reversible error. As in *Gonzales*, it appears that the read back could not

19

be arranged prior to the jury reaching its verdicts. After the jury retired for deliberations, the court made clear that, if requested by the jury, it would order the court reporter to provide read back. In response to an earlier note from the jury, the court directed the court reporter to provide the requested read back. Nothing in the record suggests that the court did not intend to order the reporter to provide the read back requested by the jury in the subsequent note.

Under the circumstances presented, we see no error. And, even if we were to assume error, defendant has failed to show prejudice. Although defendant claims that the trial court's refusal to provide the requested read back is "structural error" requiring reversal "without any showing of prejudice," our Supreme Court has held that errors in the read back requirement are errors of state law that do not implicate federal constitutional rights. (See *People v. Lucas* (2014) 60 Cal.4th 153, 301, disapproved of on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1020, disapproved of on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) Because the assumed error is a violation of state law, prejudice is evaluated under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.) Under that standard, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *People v. Watson, supra*, 46 Cal.2d at p. 836.) Defendant has made no effort to establish prejudice under this standard. Thus, no further discussion of this issue is required.

V

*Sufficiency of the Evidence*

Defendant contends reversal is required because there was insufficient evidence to establish that he was the perpetrator. In other words, defendant claims that Deputy Emmi's identification was not sufficient to support the jury's verdicts.

A. *Standard of Review and Applicable Legal Principles*

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

"Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) "It is established that the strength or weakness of an identification are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration of the jury." (*People v. Avina* (1968) 264 Cal.App.2d 143, 147.) " 'Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.)

B. *Analysis*

We conclude substantial evidence supports the jury's finding that defendant was the perpetrator. When the driver got out of the car to flee on foot, Deputy Emmi saw his face for two to three seconds from close range--approximately 15 feet. Shortly thereafter, dispatch advised Emmi that there were two possible suspects, one of whom was defendant. When Emmi searched the "mobile database" in his patrol vehicle, he identified defendant as the perpetrator after looking at a photograph of defendant. At trial, Emmi confirmed that defendant was the perpetrator. This evidence was sufficient to support the jury's verdicts. The evidence of identity was not so weak as to constitute practically no evidence at all. "The uncorroborated testimony of a single witness is

21

sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296; see also *People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Inherently improbable . . . means that the challenged evidence is 'unbelievable per se,' (italics omitted), such that 'the things testified to would not seem possible.' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 725.) The record reflects that Emmi's testimony was neither physically impossible nor inherently improbable.

VI

*Cumulative Error*

Defendant contends cumulative error resulted from the combined effect of the individual errors asserted in his opening brief.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017; see also *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Defendant has not demonstrated that there were a series of trial errors, considered collectively, that were so prejudicial as to deny him due process and a fair trial.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, Acting P. J.

We concur:

/s/
Krause, J.

/s/
McAdam, J.*

---

* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.